1
2
3
4
5

**MARY SCHULTZ**
**MARY SCHULTZ LAW, P.S.**
2111 E. Red Barn Lane
Spangle, WA 99031
Tel: (509) 245-3522, Ext. 2
E-mail: Mary@MSchultz.com

6

Attorney for Plaintiffs

7

8
9

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WASHINGTON

10
11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| **DRU CHOKER, D.V.M. and MATTHEW DEMARCO, D.V.M.,** | No. |
| Plaintiffs, | **COMPLAINT FOR DAMAGES** *15 U.S.C. §§ 1, 2* |
| V. | *And State Claims* |
| **PET EMERGENCY CLINIC, P.S.,** By and through its Board of Directors, **and** **NATIONAL VETERINARY ASSOCIATES, INC.,** acting on its own behalf and that of NVA Parent, Inc., | **JURY DEMAND** ☒ Yes |
| Defendants. | |

21

22
23
24
25

Plaintiffs **Dru Choker, D.V.M.,** and **Matthew DeMarco, D.V.M.,** through undersigned counsel **Mary Schultz of Mary Schultz Law P.S.,** submit the following complaint against the Defendants:

26

27

COMPLAINT FOR DAMAGES
Sherman Act
Page 1 of 55

28



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

# I.    STATEMENT OF THE CASE

1.1    Plaintiffs are direct competitors, and rival employers, to Defendant National Veterinary Associates, Inc. and Defendant Pet Emergency Clinic, P.S. But for years prior to December 31, 2017, Plaintiffs were employed as veterinarians at Defendant Pet Emergency Clinic, and owner/shareholders of that Clinic. Plaintiffs are now the owners and operators of an emergency veterinary hospital in Coeur d'Alene, Idaho, which they built from scratch. Their leaving the Pet Emergency Clinic and the Spokane, Washington area as veterinarians and as shareholders was not their choice.

1.2    Plaintiffs bring the present claims as an antitrust challenge to the series of agreements and contractual restraints of trade which both Defendants agreed upon, implemented, and attempted to parlay into a regional monopoly in the delivery of emergency veterinary services. By these agreements, Defendants sought to, and did, restrain trade in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §1 and §2). The monopoly goal sought by both Defendants required that Plaintiffs be fired from their jobs as veterinarians at Pet Emergency Clinic, and then ejected

MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

from the area as competitors, both of which occurred. The damage caused to both Plaintiffs is still ongoing.

1.3    This case concerns a distinct line of commerce in the United States—the provision of emergency and specialty veterinary services. Plaintiffs' essential challenge is that Defendants agreed upon a series of mutually reinforcing contractual restraints, including restraints that are unlawful *per se*, to achieve an intended outcome—Defendants' control of access to emergency and specialty veterinary services in the Eastern Washington/Post Falls, Idaho cross-state-border market, and the eradication of competition for similar services in the region. Defendants sought to create a closed network consisting of Pet Emergency Clinic as the emergency hospital hub, two specialty practices in surgical services and radiology, and over 50 outlying "feeder" veterinarian practices whose owners would be mandated to refer all customers, new and old, to the new National Veterinary Associates/Pet Emergency Clinic entity. Any shareholder who failed their referral mandate would be financially punished for violating their covenant, and all of the other shareholders equally bound would be required to bear the expense of NVA/PEC enforcing that covenant against the violator.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

1.4　　Such a closed system would prevent competition from forming, from being able to develop customers or clientele, and from thus being able to sustain itself.

1.5　　What caused Plaintiffs' damage is a "roll-up" process seen at the national level throughout the veterinary services market in the recent years. Veterinary practices, clinics, and animal hospitals are becoming increasingly acquired, and then consolidated, by corporations with the financial power to move into a local area, consolidate the veterinary services practices by mergers and acquisitions, and then restrain and prevent competition through the imposition of non-compete and non-solicitation restrictions and mandatory referral provisions on their consolidated acquisitions. This can also lead to the consolidator now imposing directed care models upon veterinarians through management contracts, whereby that management is based on metrics, thresholds and protocols. The consolidation and anti-trade restraints on members prevent patient access to competitive care, and the management model prevents consumer access to individualized and independent veterinary care. Such models lead to the danger of decreased quality of services, and/or unilateral price increases.

1.6　　Defendant National Veterinary Associates, Inc., (NVA) is



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

such a national "consolidator" corporation. As of the filing of this complaint, National Veterinary Associates, Inc. remains subject to monitoring over its monopoly practices under a ten year ongoing consent order with the Federal Trade Commission. *See In the Matter of Agnaten SE, Veterinary Specialists of North America, LLC, and NVA Parent Inc. File No. 191-0160, C-4707.*

      1.7     Defendant National Veterinary Associates, Inc. began aggressively acquiring local veterinary hospitals and pet resorts, to become, by the year 2017, an owner of some 423 locations in the United States and Canada, and by 2019, one of the world's largest veterinary and pet care service companies, owning and operating more than 670 veterinary hospitals and 70 pet resorts in 43 states, as well as in Canada, Australia, and New Zealand. NVA employed, through its acquisitions, 2,500 veterinarians and 4,000 other staff members.

      1.8     By 2019, NVA was itself then acquired by a German owned consolidator corporation, JAB Holding Co., which has controlling interests in a number of food and beverage companies in the United States. The JAB conglomerate would now compete against an American company, "Mars, Incorporated"—an American multinational manufacturer of confectionery, pet food, and other food products, but which has also now forayed into



MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

animal care services.

1.9     The environment initiating the events described in the Eastern District of Washington really began their momentum in 2015.  Mars, Inc. with its then $33 billion in annual sales, was ranked as the sixth largest privately held company in the United States by Forbes.  *See Mars.com.*

1.10    By 2017, as the facts detailed in this Complaint began unfolding, Mars, Inc. was acquiring a chain known as "VCA." The VCA chain operated and still operates in the Eastern District of Washington as VCA Animal Hospitals. At the time of this proposed acquisition, Mars and VCA were already the first and second largest owners of veterinary hospitals in the world, controlling more than 1,900 practices in the United States and Canada.  Mars animal clinics operated under the names "Banfield Pet Hospital" and "BluePearl." The proposed acquisition by Mars, Inc. of VCA, Inc. would leave Mars with some 2,000 hospitals in the U.S. and Canada, still operating under brand names Banfield Pet Hospitals and BluePearl, but now adding VCA, and "Pet Partners."

1.11    The United States Federal Trade Commission intervened to impose antitrust remedies on Mars, Inc.'s proposed acquisition of VCA.  In August 2017, the Federal Trade Commission required Mars, Inc. to divest



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

seven of its Blue Pearl "emergency and referral centers" and five VCA hospitals in order to allay antitrust concerns with this VCA acquisition. *See, e.g., "FTC to Mars: Divest 12 Clinics In Order to Buy VCA," Veterinary Information Network," August 30, 2017.* Some of the companies Mars was ordered to divest went to Defendant National Veterinary Associates Inc., then a smaller consolidator company which had 423 locations in the United States and Canada.

1.12    As the foregoing Mars/VCA acquisition process progressed, alongside the concerns publicized by the Federal Trade Commission, and beginning in late 2016, Defendant National Veterinary Associates, Inc. began its foray into the Spokane/North Idaho market.

1.13    In late 2016, NVA was invited into the Eastern Washington market by two specialty veterinarian practices—one a surgical service provider, and one a radiology provider—both of whom were tenants inside the Defendant Pet Emergency Clinic, P.S. (PEC) facility on East Mission Avenue in Spokane, Washington. Through these invitations and the ensuing negotiations, NVA targeted the Pet Emergency Clinic as part of its intended "roll-up" acquisition package.

1.14    Acquisitions by national corporations are not in themselves



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

bad, nor necessarily anti-competitive. But Pet Emergency Clinic was a unique emergency care animal hospital from which an NVA *monopoly* could emerge. PEC not only housed the aforementioned two target specialty clinics in surgical services and radiology, but it was owned by over 50 outlying shareholder veterinarians throughout eastern Washington.

1.15    By acquiring, consolidating, and then imposing anti-competitive restraints upon its specialty surgical, radiology and emergency services, and by then imposing the same restraints and added referral mandates on over 50 outlying veterinarian practices in the region, NVA could take over and prevent competition across an entire regional market throughout Eastern Washington and Northern Idaho, beginning with the Spokane, Washington/Post Falls, Idaho local market.

1.16    PEC became a willing accomplice to this anti-competitive plan, and five essential agreements were made towards achieving this monopoly goal. First, Defendant PEC would impose anti-competitive restraints upon Plaintiffs and all of its employed veterinarians in preparation for the merger/acquisition with NVA. Second, those veterinarians would be terminated from employment if they refused those restraints. Third, Plaintiffs, who indeed did refuse those restraints, were in fact terminated for



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

their resistance. Fourth, Defendants jointly used the coercive power of the Plaintiffs' stock in PEC to deprive them from creating any competing practice in the region, including across the Idaho border through Post Falls, Idaho. Fifth, Defendants jointly used the coercive power of the combined stock of PEC's over 50 outlying veterinarians in the Eastern Washington area to force Plaintiffs from creating or sustaining competition for such services throughout the cross-border region.

1.17 The agreements in this District between Defendants NVA and PEC were intended to, and did, prevent Plaintiffs from contemplating or initiating competition against both Defendants in this area. Plaintiffs were driven from the Eastern District of Washington to attempt to create, from the ground up, via construction loans and start up loans, an emergency service practice in Coeur d'Alene, Idaho, outside of NVA/PEC's intended cross-border restricted region.

1.18 The practices engaged in by and between both Defendants violated 15 U.S.C. §§ 1-2 (the Sherman Antitrust Act), and they were equally unlawful under Washington State's Unfair Business Act statutes, and contrary to its state public policy. By the foregoing actions, PEC also violated contractual agreements it had with both Plaintiffs, which had been

*MARY SCHULTZ LAW, P.S.*

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

maintained throughout the years.  The Plaintiffs have been economically and professionally damaged by the Defendants' unlawful acts.

1.19    Plaintiffs bring the present case under the Sherman Act and have pled related claims under Washington law. They seek treble damages, and costs of suit.

## II.    PARTIES

2.1    Dr. Dru Choker is a veterinarian licensed under RCW 18.92 et seq. to practice veterinary medicine in the state of Washington, and has been so licensed since 2002.

2.2    Dr. Matthew DeMarco is a veterinarian licensed under RCW 18.92 et seq. to practice veterinary medicine in the state of Washington, and has been so licensed in Washington since 2005.

2.3    Plaintiffs Dru Choker and Matthew DeMarco were both residents of Spokane County, Washington, in the Eastern District of Washington, during the acts detailed herein.

2.4    Plaintiff Dru Choker remains a resident of Spokane County, Washington in the Eastern District of Washington, but Matthew DeMarco now resides in Kootenai County, Idaho.

2.5    Plaintiffs are both now licensed to practice veterinary medicine



MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

in the state of Idaho, and are doing business in Coeur d'Alene, Idaho as Emergency Veterinary Hospital of Coeur d'Alene.

2.6    Defendant PEC is a professional service corporation formed under the laws of the state of Washington, incorporated in the state of Washington since 1977, and doing business from its principal location at 21 E. Mission Avenue in Spokane, Washington 99202.

2.7    Defendant PEC routinely engaged, and engages, in innumerable business transactions that were and are interstate in character, in and from the Eastern District of Washington, including receiving customers and patients from across state lines in Idaho and Montana.

2.8    Defendant Pet Emergency Clinic, P.S., (PEC) provided and provides emergency veterinary care within geographic areas that extend across state borders as far east as Missoula, Montana, south to the St. Maries, Idaho area, north to Idaho's Sandpoint and Bonner's Ferry, and across the Canadian border.

2.9    Defendant National Veterinary Associates, Inc. (NVA) is a corporation formed under the laws of Delaware in 1996, with its principal office and principal executive offices at 29229 Canwood Street, Suite 100, in Agoura Hills, California 91301.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

2.10    Defendant NVA is an owner, majority partner, manager, and/or operator of numerous veterinary clinics operating throughout the United States, and it now operates, owns property, and manages practices in the Eastern District of Washington.

2.11    Defendant NVA is owned by a parent Company called "NVA Parent, Inc.," incorporated in Delaware on July 11, 2014 as C5567221, which remains active. *See U.S.A. Federal Trade Commission Docket No. C-4707.*

2.12    NVA Parent, Inc., has its officers and principal place of business in Los Angeles, California.  *See U.S.A. Federal Trade Commission Docket No. C-4707.*  The NVA parent transacts the business described here through NVA.

2.13    Defendant NVA may now also be owned by another of the potential NVA companies incorporated in Delaware, including, e.g., "NVA Holdings, Inc.," "NVA Holdings, L.P.," "NVA, Inc.," "NVA Partners, L.L.C.," "NVA Acquisition Corporation," "NVA Acquisition Company," "NVA Corp. LLC," "NVA Group GPLLC," "NVA Group Inc." and/or "NVA Group LP."  Any NVA parent owner involved transacts the business described here through Defendant NVA, Inc.

2.14    Defendant NVA, Inc. engaged in the actions detailed herein in



the Eastern District of Washington, commencing no later than 2016.

2.15    The referenced actions of Defendant NVA, standing alone and in concert with Defendant PEC, affected interstate commerce within the meaning of the Commerce Clause.

### III.    JURISDICTION AND VENUE

3.1    **Subject-Matter Jurisdiction**. Plaintiffs' two federal causes of action complain of Defendants' antitrust violations of Sections 1 and 2 of the Sherman Act, which are codified respectively at 15 U.S.C. § 1 and 15 U.S.C. § 2.

3.2    Plaintiffs seek damages for these antitrust offenses under Section 4 of the Clayton Act, which is codified at 15 U.S.C. § 15.

3.3    This Court has original and exclusive subject-matter jurisdiction over each of these claims under Section 4 of the Clayton Act, as codified at 15 U.S.C. § 15 (authorizing civil, private relief for violations of federal antitrust law, and vesting the federal district courts with original, exclusive subject-matter jurisdiction over private claims for violations of federal antitrust law).

3.4    This Court has subject-matter jurisdiction over Plaintiffs' 15 U.S.C. § 1 and 15 U.S.C. § 2 claims under 28 U.S.C. § 1331 (vesting all



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

federal district courts with original jurisdiction over any claim that arises under a statute of the United States) and under 28 U.S.C. § 1337(a) (vesting all federal district courts with original jurisdiction over any claim that arises "under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.")

3.5    Plaintiffs' remaining causes of action arise under the common and statutory laws of the state of Washington, and these causes of action arise from the same transactions, occurrences, and "common nucleus of operative fact" as give rise to Plaintiffs' federal claims.

3.6    This Court can exercise supplemental subject matter jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 (a), in that Plaintiffs' state claims are so related to claims in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.7    This Court should exercise its pendant subject-matter jurisdiction over each of Plaintiffs' state-law claims in order to promote judicial economy, convenience and fairness to litigants, to avoid duplicative procedures, and to avert the risk of inconsistent adjudications of the same issues of fact and law.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

3.8    **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants under 15 U.S.C. §§ 15 and 22 because PEC maintains their business headquarters in this District, and both PEC and NVA conduct business in this District and have systematic, continuous, substantial, and ongoing ties to it.

3.9    **Venue.** This Court is the proper venue for the present action because Defendant PEC resides and is found in this judicial district and transacts business in this district, and Defendant NVA is found and transacts business in this District, per 15 U.S.C. §§ 15 and 22. Moreover, Defendants engaged in the challenged business practices in this District, and Plaintiffs suffered proximate losses in this District.

WHEREFORE, reasserting the above, Plaintiffs assert the following:



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

## IV.    OPERATIVE FACTS.

**A.    The environment in which Defendants' agreements were made was an environment of ongoing consolidation.**

4.1    The veterinarian industry has become increasingly closed through "consolidator" corporations at the national and international level. Defendant National Veterinary Associates, Inc. is such a consolidator company.

4.2    National Veterinary Associates' ownership vis-à-vis its precise NVA Parent and the ultimate JAB Holding Co. remains to be fully determined.

4.3    In the relevant time frame discussed here, meaning the fall of 2016 through 2019, NVA was owned by private equity owners Ares Management Corporation and OMERS Private Equity.

4.4    NVA was "expanding aggressively via acquisitions" during these years, and owned roughly 670 veterinary hospitals and 70 pet resorts across the US, Canada, Australia and New Zealand, with revenues rising 30 percent a year to reach $1.6 billion on a pro forma basis annually, according to disclosures that JAB made to rating agency S&P Global Ratings.[1]

---

[1]    *See* "JAB Makes Second US Vet Chain Purchase," June 17, 2019,

MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

4.5     NVA was "one of the world's largest veterinary and pet care service companies." *See* American Veterinary Medicine Association (AVMA).[2]

4.6     By June 2019, German investment company JAB Holdings bought a majority stake in NVA, which was publically announced in a June 17, 2019 Financial Times publication. *See Nte.1.*

4.7     JAB Holding Co. had, and has, controlling interests in a number of food and beverage companies in the United States. *See Nte.2.*

4.8     Earlier that year, in February 2019, JAB had first bought "Compassion-First Pet Hospitals" for $1.2 billion. Compassion-First operates specialty, emergency, and general practice veterinary hospitals in a dozen states. *See Nte 2.* [3]

---

Financial Times, Abboud (London),

https://www.ft.com/content/4b99ca82-90f2-11e9-aea1-2b1d33ac3271.

[2]  *See* "NVA Clinics Purchased by German-owned Company," August 14, 2019, JAVMA News, https://www.avma.org/javma-news/2019-09-01/nva-clinics-purchased-german-owned-company.

[3]  *See also, e.g.*, "Compassion-First owner to acquire National Veterinary Associates," Today's Veterinary Business in June 2019,

*M*ARY
*S*CHULTZ
*L*AW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

4.9    On the heels of JAB's Compassion-First acquisition, the NVA purchase would then put JAB "more directly in competition with Mars Inc.," which the AVMA described as "not only … one of the world's biggest sellers of pet food with its Pedigree, Iams, and Royal Canin brands, but (which) also has been acquiring veterinary clinic chains in recent years, purchasing VCA Animal Hospitals for $9.1 billion in 2017 and AniCura Holding AB in Europe last year." *See Nte.2.*

4.10    Mars, Inc. had also been acquiring veterinary practices in the prior years, acquiring a US group called VCA Animal Hospitals for $9.1 billion in 2017 and AniCura Holdings in Europe (for an undisclosed price). *See Nte. 2.*

4.11    NVA would now become a "portfolio company of JAB Holdings," but continued its own process of acquisitions.[4]

---

https://todaysveterinarybusiness.com/compassion-first-owner-to-acquire-nva/.

[4]    *See* "Petwell Partners Has Agreed To Be Acquired By National Veterinary Associates, a Portfolio Company of JAB Holding Co." Keystone    Capital    Markets,    Cain    Brothers    division, https://www.cainbrothers.com/transactions/petwell-partners-has-agreed-



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

4.12    By early 2020, the Federal Trade Commission (FTC) addressed the anti-competitive environment of this acquisition. Defendant National Veterinary Associates, Inc. and Compassion-First agreed to divest facilities in three cross-state-border local market locations to MedVet Associates, LLC, to settle Federal Trade Commission charges that Compassion First's now proposed $5 billion acquisition of NVA itself would violate federal antitrust law. [5]

4.13    The markets being monopolized in this NVA/Compassion First process were local cross-state-border markets consisting of specific adjoining cities in North Carolina and South Carolina, and in the Connecticut and New York region. An intrastate market was also at issue in the Fairfax and Manassas, Virginia area.

4.14    The FTC's consent order with NVA notes how such local market acquisitions would violate the Sherman Act "by lessening

---

to-be-acquired-by-national-veterinary-associates-a-portfolio-company-of-jab-holding-co/.

[5]    *See* In the Matter of Agnaten SE, Veterinary Specialists of North America, LLC, and NVA Parent Inc. File No. 191-0160, C-4707; *and see* FTC press release April 10, 2020.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

competition in the markets for certain specialty and emergency veterinary services in three different localities in the United States." *Id., Agreement Containing Consent Orders; and see attendant FTC "Analysis of Agreement Containing Consent Orders to Aid Public Comment."*

4.15    The "merger to monopoly" process being used increased the likelihood that Compassion-First could unilaterally raise prices or decrease quality for specialty and emergency veterinary services, according to the FTC complaint.

4.16    The FTC noted the same anti-competitive effect that would harm these Plaintiffs: "Entry into the relevant markets (by competitors) would not be timely, likely, or sufficient in magnitude, character, and scope to deter or counteract the anticompetitive effects of the Acquisition,".... "for de novo entrants, obtaining financing to build a new specialty or emergency veterinary facility and acquiring or leasing necessary equipment can be expensive and time consuming." *FTC Agnaten "Analysis of Agreement Containing Consent Orders to Aid Public Comment."*

4.17    The ability to monopolize the veterinary services industry is extremely and increasingly lucrative.  The AMVA reports that "[P]et care spending in 2018 reached a record high of $72.56 billion, compared with



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

$69.51 billion in 2017, an increase of over 4%, according to the American Pet Products Association." *See Nte. 2.* The veterinary <u>care</u> aspects of this spending were approximately $18.11 billion, "surpassing growth in all other categories with an increase of 6.1% from 2017." *Id.* The Financial Times noted similar figures, reporting that "The overall market has doubled in size in the past 15 years." *See Nte. 1.*

      4.18   Decreased quality of services available to consumers and increased price aspects of consolidation arise not just by preventing competition, but by the consolidator corporation then imposing directed care models upon its acquired practices—directed care models that have long been controversial among veterinarians. Consolidator corporations first acquire and consolidate practices, and then apply "management" techniques to their owned entities, applying metrics, benchmarks, protocols, and thresholds for performance upon the captured veterinarians. Metrics and performance benchmarks are provided by companies such as "VetSupport," (www.vetsupport.com), which collaborate with practice management software companies such as the Toronto, Ontario based "VetSuccess" (www.Vetsuccess.com). The data from the imposition of these models is analyzed and used to maximize profits to the owning corporation.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

4.19    These directed care models may or may not be necessary or in a patient's best interest, but they are required under management. Because competition has been eradicated from areas monopolized or networked, customers then become unable to find a clinic or emergency services facility that is not an NVA-managed facility, and so the customer meets the same managed care metrics model wherever they go in the region.

4.20    The foregoing model is what was attempted here, and in the process, caused Plaintiffs' damages.

**B.    Plaintiffs are former employees and former shareholders of PEC.**

4.21    Plaintiffs Dru Choker and Matthew DeMarco are former employed emergency veterinarians of Pet Emergency Clinic (PEC).

4.22    Dr. Dru Choker was employed by PEC as a veterinarian from December 2002 to December 31, 2017.    PEC's Board of Directors terminated Dr. Choker's employment on November 15, 2017 because she refused to sign a new employment agreement with restrictive terms. She was allowed to work through December 31, 2017.

4.23    Dr. Matthew DeMarco was employed by PEC as a veterinarian from May 2005 to December 31, 2017.    PEC's Board of Directors terminated Dr. DeMarco's employment on November 15, 2017



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

because he refused to sign a new employment agreement with restrictive terms. He was allowed to work through December 31, 2017.

4.24    Plaintiff Drs. Choker and DeMarco are also former shareholders of PEC, having become shareholders in the years 2003 and 2007 respectively.

4.25    No shareholder in PEC may own more than 1000 shares, per PEC bylaws, and Dr. Choker became the owner of 45 shares in PEC, with Dr. DeMarco becoming the owner of 111.19 shares.

## C.    **PEC was created as a veterinarian emergency service clinic to be operated by local veterinarians.**

4.26    When Plaintiff Drs. Choker and DeMarco became shareholders of Pet Emergency Clinic (PEC) in the years 2003 and 2007 respectively, and continuing thereafter, PEC used restrictions on its stock only to ensure that it remained a locally controlled resource for the community.

4.27    PEC's Articles of Incorporation (AI) ensured that all of its shareholders were veterinarians duly licensed to practice veterinary medicine, surgery, and dentistry in the state of Washington. *See Articles of Incorporation, March 28, 1977 at Art. III.*

4.28    Any veterinarian shareholder who sold their shares in PEC



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

was required to sell his or her shares back to PEC, or to a similar local veterinarian licensed to practice in the state of Washington. *See AI, Art. VIII, Restraints on Alienation, § A, and § C.*

4.29    PEC's bylaws further restricted share ownership to those individual veterinarians whose principal place of business was situated in the state of Washington within a 50-mile radius of the corporation's office at 21 E. Mission Avenue in Spokane, Washington. *See Bylaws, Art. VII, § A(1).*

4.30    PEC's bylaws further restricted the quantity of each individual's share ownership in PEC to no more than 1,000 shares. *See Bylaws, Art. VII, § A(1).*

4.31    Any sale of PEC by its directors was required to conform to the stated bylaw restrictions. *Art. IV, § F.*

4.32    PEC stock carried no restrictions or mandates other than the foregoing.

4.33    Plaintiffs' employment as veterinarians was also at-will, meaning that if resignation were desired or termination occurred, Plaintiffs could freely compete with PEC for the delivery of emergency care services in the Spokane area.

4.34    Over fifty (50) veterinarians in the area became shareholders


MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

of PEC, but none of those fifty-plus veterinarians were required to refer to PEC, and all could use any competitor emergency veterinarian service that became available in the market.

4.35    Over the years of their employment with and ownership of PEC, both Plaintiffs developed the ability to compete with PEC as an emergency service provider if they left PEC or were terminated, having become deeply experienced over time in the skilled delivery of emergency services.

4.36    PEC's model was pro-competitive—Plaintiffs continued to provide quality emergency pet care for excellent compensation benefits, thereby choosing to remain with the clinic they built, providing continuity to patients and to the surrounding veterinarians in the community, and developing significant experience in care. Outlying veterinary facilities could refer to PEC, or not. The consumers of veterinary care benefitted from free trade and from the ensuing quality of care.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

**D.**    **NVA targeted Defendant PEC in Spokane, Washington because of PEC's unique geographic reach.**

4.37    By 2016, NVA had made inroads into the state of Idaho, and was an owner of facilities in southern Idaho.

4.38    Near northwestern Idaho, and in late 2016, retiring Spokane veterinarian, Joseph Harari, the owner of Veterinary Surgical Specialties, decided to sell his specialty practice, and contacted NVA in California to promote the sale of his practice.

4.39    Dr. Harari's surgical services were uniquely needed by veterinarians throughout the community and by PEC itself.

4.40    Dr. Harari also had a unique relationship with PEC. Dr. Harari's practice operated out of the PEC building, and he leased space from PEC.

4.41    Dr. Harari was also a major stockholder in PEC, and a person who routinely interacted with PEC employees and the PEC Board of Directors.

4.42    Dr. Jeffrey Siems had a similar unique specialty practice, and a similarly unique relationship with PEC. Dr. Siems owned and operated a radiology practice, which was also needed by veterinarians throughout the



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

community and by PEC.

4.43     Dr. Siems' practice also operated out of the PEC building, and he leased space from PEC.

4.44     Dr. Siems was also a major stockholder in PEC, routinely interacted with PEC employees and the PEC Board of Directors, and, in the relevant time frame of the acts described in this complaint, became and acted as the President of PEC's Board of Directors.

4.45     NVA's acquisition model targets practices that generate over $1.5 million dollars per year in revenue.

4.46     It is unclear as to whether each specialty practice owned by Drs. Harari and Siems met or exceeded this threshold.

4.47     But NVA became aware through negotiations with Drs. Harari and Siems that the foregoing practices' landlord, PEC, generated millions of dollars a year in revenue. Per September 30, 2016's year-end adjusted net income statement, in 2016, PEC generated $5.3 million in revenue.

4.48     NVA became aware that PEC was also owned by 50-plus independent veterinarians throughout the geographic region.

4.49     NVA thus became aware that, by acquiring the two specialty practice tenants, and by then acquiring PEC, it could restrict its now



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

employed veterinarians from competing, and then further impose non-compete and referral mandates upon 50-plus PEC *shareholders* in the surrounding area, creating a closed network which would prevent competition in emergency veterinary services in the eastern Washington and northwestern Idaho "corridor" market of Spokane, Spokane Valley, and Post Falls, Idaho.

4.50    NVA thereby began its efforts to acquire the willing Drs. Harari and Siems' corporations, and, in the process of those acquisitions, urged, and even required, that Drs. Harari and Siems obtain PEC's authorization to allow the veterinarians to sell their PEC shares to NVA, instead of back to PEC itself.

4.51    By this mode, once NVA became a majority shareholder in PEC, it could vote to sell PEC to NVA, and then agree to the shareholder restrictions and mandates as PEC's majority shareholder.

4.52    But as NVA's discussions with Drs. Harari and Siems evolved, PEC's Board of Directors began negotiating directly with NVA to sell PEC outright to NVA, understanding that NVA's intention was to impose shareholder restrictions upon all, creating a monopoly area.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

### E.    Defendants concerted action to restrain trade.

4.53    PEC's Board obtained documents from NVA which made it aware of NVA's acquisition model and anti-competitive restraints. Drs. Harari and Siems also had such material from NVA.

4.54    PEC's Board necessarily understood that NVA's expectations in any merger and sale would include restraints on trade, including non-compete and non-solicitation agreements, because of NVA's acquisition model as described above in Section IV (A).

4.55    PEC began engaging in agreements with NVA in concerted action to implement anti-competitive measures and the creation of a closed system in emergency veterinary care.

4.56    PEC and Drs. Siems and Harari were all represented and counseled by the same Spokane law firm. All negotiations therefore proceeded in unison, as any conflict between PEC and Drs. Harari and Siems' goals would have prevented that unified representation.

4.57    NVA, PEC, and the two specialty practice owners' communications were generally covert, not documented in writing, often attorney-client privileged, and done outside the presence of PEC shareholders and employed veterinarians such as Plaintiffs.



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

4.58    PEC's Board now appointed Dr. Jeff Siems as its President.

4.59    PEC's Board knew that Dr. Siems was already selling his practice to NVA, and that NVA wanted PEC as a part of its acquisition package with Drs. Harari and Siems.

4.60    By no later than April 2017, working in concert with NVA, now PEC Board president Dr. Siems brought in "VetSupport Consulting" to begin assessing national norms and metrics of desired salaries for PEC's longstanding veterinarians.

4.61    PEC became newly refashioned within the VetSupport process as "Pet Emergency Clinic and Referral Center."

4.62    The "referral center" addition to PEC's name was intended to denote the intended referral hub for the region, to which referrals would be expected, and is seen e.g. in the FTC Consent order in *Agnaten*, with Virginia based entities required to be divested.

4.63    Using the VetSupport process, PEC began implementing reduced compensation for  PEC's veterinarians, including Plaintiffs, to national levels acceptable to NVA, and effecting the displacement of PEC's longstanding practice manager, also an employed veterinarian, to implement a new "full-time practice manager" who could begin applying NVA's metrics.



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

4.64    Dr. Siems, now as the PEC Board President, and followed by the Board itself, began creating conflict among the PEC emergency veterinarians, PEC's internal medicine specialists, and its employee staff. The Board began positioning the latter against each other as well as against the Board of Directors to promote the theory that PEC now suffered from a "lack of management" which required more "professional" management.

4.65    Dr. Siems' claims were the reverse of a historically successful growing and thriving local practice model that had been used by PEC for decades.

4.66    Dr. Siems began denigrating the Plaintiffs, as well as the other emergency veterinarians, telling PEC's Board, e.g., how PEC's emergency veterinarians were grossly overpaid, greedy, "toxic" to the environment, and would "work to sabotage any new compensation structure" which PEC's Board now intended to impose.

4.67    PEC's Board simultaneously sought to impose the "maximum possible non-compete agreement" on Plaintiffs and the other emergency veterinarians, which NVA would require in its acquisition.

4.68    In the state of Washington, non-compete agreements cannot properly be imposed upon those already employed while simultaneously



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

reducing that employee's compensation.

4.69    Thus, PEC's Board, through its consolidated counsel with Drs. Harari and Siems, thereby fashioned a contract that PEC falsely claimed did not contain non-compete restrictions.    In fact, the language of certain specific paragraphs applied *indefinite* and *geographically unrestricted* non-compete and non-solicitation restriction upon the veterinarians. PEC's actions were intentionally deceptive.

4.70    Defendants fully intended a maximum non-compete, and indeed this was necessary for an NVA merger-to-monopoly process described in Section IV (A).

4.71    Plaintiffs refused to sign that new employment contract because of its transparent restrictions, and on November 15, 2017, PEC's Board of Directors terminated Plaintiffs for their refusal to sign.

4.72    Other employed emergency veterinarians at the practice had also been resisting the contracts, but capitulated and signed the agreements. There was one exception. Dr. Gerda McAuliffe chose to retire from the practice of veterinary medicine instead of signing.

4.73    Plaintiffs did not retire, and having refused to sign restrictions before being terminated, Plaintiffs were now free agent competitors of PEC.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

4.74    PEC and NVA thereupon agreed to impose five-year and 25-mile non-compete and non-solicitation restrictions onto Plaintiffs' still owned PEC stock through NVA's acquisition of their respective stock.

4.75    NVA specifically intended to reach across state lines through the Spokane/Coeur d'Alene interstate corridor, and prevent Plaintiffs from any competing operation in the local geographic market.

4.76    Plaintiffs were now unable to initiate an emergency veterinary practice in Spokane or in Post Falls, Idaho because they would be potentially subject to an injunction by NVA/PEC upon the acquisition.

4.77    In January and April 2018, NVA began implementing its merger-to-monopoly in the Spokane geographic area.

4.78    All local entities being acquired remained represented by the same law firm.

4.79    First, in January and April 2018, NVA formally acquired majority interests in both Dr. Siems' radiology practice and Dr. Harari's surgical specialty practice respectively, placing both entities under non-compete, referral, and then practice management agreements.

4.80    On May 20, 2018, PEC and NVA then signed a written terms of sale agreement whereby PEC agreed that all of its employed veterinarians



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

would be under non-compete/non-solicitation agreements agreeable to NVA by the time of the closing of the sale, and that PEC's 50-plus veterinarian shareholders in the community would agree to a five year/25 mile non-compete, non-solicitation, and referral mandate in NVA's acquisition of their shares.

4.81    By August 17, 2018, NVA and PEC's counsel circulated a proposed merger agreement to PEC which reveals the monopoly method intended throughout the region.

4.82    The agreement, in its draft form, shows Defendants agreeing in concept that NVA would merge into PEC by using a Washington sub-corporation to be created by NVA, and to be known as "NVA PEC Merger Sub, Inc.," which would merge into, and become, PEC.[6]

4.83    NVA does not list entities it owns and operates on its website. For a competitor or for a consumer to determine if a facility is NVA owned, that consumer or competitor must make a request for contact through NVA's website.

4.84    This type of merger would thus allow PEC to continue

---

[6]  This "merger sub" process is used in an NVA pattern of monopoly, and it has at least two "Merger Sub, Inc." entities incorporated in the state of Delaware as of 2014.

COMPLAINT FOR DAMAGES
Sherman Act
Page 34 of 55

𝓜ARY
𝓢CHULTZ
𝓛AW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

operating publically under its same name as if no acquisition had occurred, and as if PEC remained operating under local management. There would be no sign of NVA on patient forms or billing for PEC, or for the two specialty practices also acquired, or on the outlying practices under restrictive provisions.

4.85    This would ensure that patients, as well as state and federal agencies, would be unaware of the merger/monopoly process, and the imposition of nationally directed care models.

4.86    If successful, then through shareholder restrictions throughout the outlying community, PEC patients going elsewhere for "second opinions" would be referred back to PEC, without being aware of the referral mandates.

4.87    NVA/PEC agreed that all outlying veterinarian shareholders whose shares were acquired would be prohibited from "Interference with Relationships." *See Merger Agreement, Article 6, para. 6.4.*

4.88    A shareholder whose shares were acquired would be prohibited from soliciting or encouraging any customer of NVA/PEC to alter that customer's relationship with NVA/PEC. *Id.* This restrained competition from PEC's veterinarians, and from over 50 local veterinary practices from recommending or referring ongoing PEC customers to any



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

competitor.

4.89    Moreover, NVA/PEC mandated that those same shareholders ("shall") "use his, her or its reasonable, good faith efforts to actively refer customers to" NVA/PEC. *Id.* This captured the global pool of new customers, not simply existing customers.

4.90    Were an acquired shareholder to not actively refer new customers to NVA/PEC, this provision required that they justify that decision to NVA/PEC to avoid being accused of interfering in the latter's intended monopoly on "customers." A shareholder would be required to justify to NVA/PEC why "reasonable professional judgment" required the referral of a new customer elsewhere. *Id.*

4.91    NVA/PEC agreed that all outlying veterinarian shareholders whose shares were acquired would be prohibited from "seek(ing) to influence" any employee's relationship with NVA/PEC. *Id.* This would restrain over 50 local veterinary practices from competing for experienced employees.

4.92    Under the same agreement for non-interference, PEC and NVA agreed that a shareholder whose shares were acquired would also be prohibited from soliciting or encouraging any supplier of NVA/PEC to alter



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

that supplier's relationship with NVA/PEC. *Id., para. 6.4.* This restrained free trade and open dealing with suppliers by making such negotiations fraught with risk for any shareholder.

4.93    PEC and NVA agreed that shareholders would each be required to acknowledge in writing that they would be bound by these foregoing Article 6 covenants, as well as by Article 7 post closing covenants. *See Article 1, para. 1.5(b).*

4.94    The Merger Agreement's Article 7 "Post Closing Covenants," to which each shareholder committed, effectively imposed financial penalties on each shareholder collectively, regardless of whether they might individually violate a covenant. Those penalties could be severe. If one shareholder violated a covenant, each and all of the 50 plus shareholders whose shares had been acquired would be required to indemnify NVA/PEC, "jointly and severally," for the latter's enforcing their covenant against the single violator. *Article 7, para. 7.1.* This restrained free trade and open dealing with employees, customers and suppliers by making the entirety of the shareholders themselves pay for NVA/PEC to enforce the shareholder restrictions against any given shareholder.

4.95    Each shareholder, after they had sold their shares to NVA, was



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

to indemnify NVA/PEC and its Board of Directors in and for any lawsuit, claim, or need for the latter to enforce the shareholder restrictions against the shareholders themselves. *Id., para 7.1 (a)(i).* This mandatory indemnification restrained free trade and open dealing with employees, customers and suppliers by making the shareholders themselves pay for NVA/PEC to enforce the shareholder restrictions against any given shareholder.

4.96    This indemnification clause also required shareholders to indemnify NVA/PEC and its Board of Directors from and for any investigation by any "governmental agency," under contractual conditions that were, at best, vague. *Id. para. 7.1 (a)(iii).* This restrained trade because it made clear that a shareholder seeking assistance from any federal agency, such as the FTC, to get out from under the onerous nature of the restraints imposed, would have to financially indemnify NVA/PEC for its attorney fees and costs in defending against any ensuing FTC investigation.

4.97    NVA/PEC also agreed that shareholders who dissented from signing these covenants as a part of the sale would not receive any consideration for their shares, and their shares would be cancelled. *See Merger Agreement, Article 1, para. 1.6.*

4.98    NVA and PEC also agreed that fully executed employment



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

agreements would be delivered by PEC committing each individual veterinarian to the anti-competitive restraints, in a manner satisfactory to NVA. *Merger Agreement, Article 5, para. 5.2(k) and (l).*

4.99    NVA and PEC then agreed to the inevitable "Management Services Agreement" with NVA, which was to be affected between PEC and a company which NVA would form to be called "Medical Assets to Veterinary Services of Washington, P.C., a Washington professional service corporation (the "Professional Corporation")." *See Merger Agreement, Article V, Closing, para. 5.2 (i).*

4.100    NVA and PEC agreed to an additional "Administrative Services Agreement" with NVA. *See Merger Agreement, Article V, Closing, para. 5.2 (j).*

4.101    NVA and PEC agreed that PEC would transfer and convey all of its "Medical Assets" to NVA's to-be-formed "Veterinary Services of Washington, P.C.," a Washington professional service corporation (the 'Professional Corporation')." *Merger Agreement, Recitals at para. E.*

4.102    NVA and PEC agreed that PEC would sell all of its owned real property to another NVA sub-entity which would be created and known as "NVA PEC RE, LLC," to be created as a Delaware limited liability



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

company, known as the "Real Estate Buyer." *Merger Agreement, Recitals at para. D.*[7]

4.103    NVA and PEC fully understood that all of these corporate/sub corporate transactions were sales of PEC stock, not to veterinarians licensed to practice in the State of Washington, per PEC bylaws, nor were these transactions to bring on, as the Board put it to shareholders, "someone who could help with our professional management." Both understood this was, and both intended it to be, a merger-to-monopoly consolidation intended to prevent competition within the region, including, specifically, any competition from Plaintiffs.

4.104    As a part of PEC/NVA's concerted actions and agreements to restrain trade, and Plaintiffs' resistance to such tactics, Plaintiffs were terminated from employment, and then excluded from the Spokane, Spokane Valley and northwest Idaho region.

4.105    Plaintiffs were required to locate commercial property outside the restricted area, invest their own money, take out loans, create plans, find contractors, and begin building an emergency veterinarian practice in Coeur d'Alene, Idaho, outside of the 25-mile radius, with all of the attendant

---

[7]    NVA has a similar NVA RE, LLC incorporated in Delaware as of

MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

financial investment and hardship, while having no stable income as veterinarians.

4.106  The Coeur d'Alene market is substantially smaller than the Eastern Washington/Northwest Idaho corridor market, and Plaintiffs suffered substantial economic damage from the foregoing anti-competitive actions of both Defendants.

4.107  Following Plaintiffs filing of a lawsuit alleging unfair business practices in the Superior Court of Washington, Spokane County on August 13, 2018, Defendants suspended their ongoing finalization of the foregoing merger agreement. Those negotiations remain suspended, with the danger of the intended monopoly continuing to exist.

4.108  Following their filing of a lawsuit alleging unfair business practices in the Superior Court of Washington, Spokane County on August 13, 2018, and following intervention of legal counsel thereafter, both Plaintiffs were able to redeem their shares from PEC in late December 2019, and are no longer shareholders.

4.109  As of November 1, 2020, NVA remains in an acquisition mode, now acquiring a company called "PetWell Partners" ("PetWell"),

September 2018.



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

another national network of veterinary hospitals, as a "portfolio company of

JAB Holding Company." *See Keystone Capital Markets, Nte. 4.*

WHEREFORE, reasserting the above, Plaintiffs assert the following:

## V.     FEDERAL CAUSES OF ACTION.

**A.     Sherman Act Section 1 – Contracts and Conspiracies in Restraint of Trade.**

5.1     15 U.S.C. § 1 of the Sherman Act prohibits agreements that unreasonably restrain trade, including contracts, trusts, and conspiracies, among the several States.

5.2     NVA and PEC (1) entered into agreements, contracts, and combinations in restraint of trade, and conspired to do so, taking concerted action toward the common goal; (2) the agreements made would unreasonably restrain trade; and (3) the restraints would harm competition, not just Plaintiffs as competitors.

5.3     The commitments to this common scheme were intended to involve and affect interstate commerce, and did so.

5.4     The goal of this single conspiracy between both Defendants was to combine to prevent Plaintiffs from competing for emergency

MARY
SCHULTZ
LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

veterinary services in eastern Washington and the Washington-Idaho corridor.

5.5     The overt agreements by which this goal was to be effectuated were as follows:

5.5.1     To impose restraints on Plaintiffs as veterinarians employed with PEC so they could not become competitors;

5.5.2     To inform Plaintiffs that they would be terminated if they resisted the restraints, which Defendants did;

5.5.3     To terminate Plaintiffs for resisting the restraints, which Defendants did;

5.5.4     To use the coercive power of Plaintiffs' PEC stock to prevent them from competing with Defendants; and,

5.5.5     To use the coercive power of the combined PEC stock of over 50 veterinarians in the area to deprive Plaintiffs of consumers which could support any competing practice.

5.6     The Defendants' agreements were express and implied, explicit and tacit, and demonstrated unity of purpose, common design and understanding, conspiracy to achieve unlawful goals, and a meeting of minds in this unlawful arrangement.



$\mathcal{M}$ARY
$\mathcal{S}$CHULTZ
$\mathcal{L}$AW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

5.7     The foregoing was intended to, and did, deny Plaintiffs the right to compete against PEC/NVA in the area.

5.8     The agreements were *per se* unreasonable, because they were harmful to competition and not reasonably justified. The agreements were intended to, and did, substantially suppress competition within the relevant market area of Spokane, Spokane Valley and the northwestern Idaho business corridor, and required Plaintiffs to initiate their competing practice in Coeur d'Alene, Idaho.

5.9     Defendants' horizontal agreements with each other were agreements to allocate customers and geographic markets, and were *per se* unlawful.

5.10    Defendants' vertical agreements were between and among entities at different levels of the distribution chain, including NVA, PEC and, e.g., specialists Drs. Joseph Harari and Jeffrey Siems, and fifty plus outlying shareholders, and involved the same non-compete, non-solicitation and referral provisions detailed above, and were unlawful.

5.11    Even if NVA and PEC had no intent or purpose unreasonably to restrain trade or to monopolize, the necessary and direct result of their proposed master agreements was the restraining or monopolizing of trade



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

within the meaning of the Sherman Act, and is actionable.

5.12    The foregoing violates 15 U.S.C. § 1 (the Sherman Act).

5.13    Plaintiffs were injured as a direct and proximate result of the foregoing agreements in conspiracy to restrain trade, as follows:

5.13.1    Plaintiffs were terminated from PEC for refusing to sign anti-competitive agreements, and suffered loss of income, loss of reputation and standing, financial hardship, career disruption, professional and social isolation, and significant emotional distress; and,

5.13.2    Plaintiffs were then excluded from competition in the cross-border region when Defendants notified them of intended share restrictions upon them as able competitors, and suffered the ensuing incurring of debt, start-up costs, substantial time recreating an emergency hospital, and loss of ongoing income, stress, and hardship, all of which stem from, and were caused by, Defendants' conspiracy to implement anti-competitive restraints of trade upon them as competitors.

5.14    Defendants' unlawful acts fell short of the ultimate goal and results condemned by the Act, but not before inflicting the irreversible damage stated thus far, because Plaintiffs took legal action, and Defendants suspended their attempts to restrain trade; however, those efforts were only

*MARY*
*SCHULTZ*
*LAW, P.S.*

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

suspended. This created and creates the continuing dangerous probability of a completed result, and "radiates a potential for future harm" to competition.

**B.    Sherman Act Section 2 – Attempt to monopolize.**

5.15     15 U.S.C.A. § 2 (the Sherman Act) prohibits every person, which includes a corporation, from attempting to monopolize, or combining or conspiring with any other person or persons, to monopolize any part of the trade or commerce among the several States.

5.16     Defendants jointly conspired to destroy competition in the emergency veterinary services market; they engaged in anticompetitive conduct directed to accomplishing that end as detailed in the foregoing facts, and Defendants had a dangerous probability of success.

5.17     The agreements summarized in Section (V)(A)(§5.5) above, detailing the Section 1 violations, were overt acts engaged in by both Defendants in their attempt to monopolize, and their conspiracy to attempt to monopolize, the emergency veterinary services market in eastern Washington and the Idaho corridor.

5.18     Defendants' combined purpose was to deny competitors, including Plaintiffs, any second facility that would have any reasonable



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

access to patients and to the referrals that it would need in order to compete with PEC/NVA in this region.

5.19    Defendant NVA had the financial market power to monopolize, and Defendant PEC had the shareholder base to monopolize. Both Defendants, therefore, acting in concert and in conspiracy, had the ability to effect this monopoly on emergency veterinary services.

5.20    The foregoing violates 15 U.S.C. § 2.

5.21    Plaintiffs suffered injury caused by antitrust conduct of the type the antitrust laws were intended to prevent, including expulsion from competition in the region via threats against their stock ownership. Plaintiffs' injuries flowed from the actions that made Defendants' acts unlawful.

5.22    Plaintiffs' injuries from this attempted monopoly include the damages above pled at Section V (A) (5.13).

5.23    After causing the foregoing irreversible damage to the Plaintiffs, Defendants' unlawful acts fell short of the ultimate monopoly and results condemned by the Act because Plaintiffs took legal action; however, the dangerous probability of the intended result is as violative as would have been a completed result.  The actions were only suspended due to NVA's



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

knowledge of their unlawfulness, and Defendants' actions radiate a potential for future harm to competition.

## VI.    STATE CAUSES OF ACTION.

### A.    Unfair restraint of trade business practices in violation of RCW § 19.86.

6.1    By and after December 2016, and by and through the actions described at Section V above, PEC and NVA, acting of each's accord, and in concert and conspiracy with the other and with third parties, engaged in conduct which violates Washington State's Constitution Art. XII, § 22, and its enacted prohibitions of RCW § 19.86.020 (unlawful competition and trade practices), RCW § 19.86.030 (conspiracy in restraint of trade), RCW § 19.86.040 (monopolies and attempted monopolies) and RCW § 19.86.060 (acquisition of stock by another corporation to lessen competition).

6.2    By use of employee and PEC shareholder non-compete, non-solicitation, and referral agreements, including the November 2017 employment agreements, the May 2018 terms-of-sale agreement, and the August 2018 merger agreement, NVA and PEC sought to bind and restrict Plaintiffs, other ER veterinarians at PEC, and over 50 veterinary practices in



the Spokane, Spokane Valley and North Idaho area, from competition within 25 miles from PEC/NVA's emergency care for five years.

6.3    The manner in which these were imposed and intended to be imposed was deceptive, including by material omission.

6.4    PEC's November 2017 employment agreement was unreasonable, because it imposed unrestricted non-competition and non-solicitation requirements upon veterinarians who were already employed by PEC, without additional consideration, while reducing their compensation, for an indefinite period of time and throughout an undefined geographic range.

6.5    The manner in which these restraints were imposed and intended to be imposed was deceptive, including by material omission.

6.6    PEC/NVA's May 2018 agreed terms of sale imposing restrictions on shareholders were also unreasonable, because the agreement imposed non-competition, non-solicitation, and referral provisions upon veterinarians within a 25 mile region around PEC for five years.

6.7    The manner in which this was to be imposed was deceptive, including by material omission.

6.8    Resistance to the latter restraints of trade were the cause of



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Plaintiffs being terminated, and then being driven from, and excluded from, the Spokane/Spokane Valley/northwestern Idaho region.

6.9     NVA/PEC's actions and agreements were *per se* unreasonable, because they were intended to and did substantially suppress competition from the Plaintiffs within the relevant market area of Spokane, Spokane Valley, and northwestern Idaho.

6.10    Defendants' actions caused Plaintiffs damages, including those damages pled at Section V (A) (5.13).

**B.    <u>Wrongful Termination in Violation of Public Policy</u>.**

6.11    Washington has a public policy against anti-competitive and/or deceptive business practices, and its public policy protects employees from retaliation by termination for refusing to enter into non-compete agreements that unreasonably seek to restrain trade.

6.12    For the reasons described above, PEC's mandated employment agreement was unreasonable because it imposed non-competition and non-solicitation requirements upon veterinarians who were already employed by PEC, without additional consideration, while reducing their compensation, and for an indefinite period of time and undefined geographic range.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

6.13     PEC's firing of the Plaintiffs was in violation of this state's public policy by terminating them in retaliation for their refusing to sign such a non-compete agreement which was unenforceable under Washington state law, and in violation of this state's public policy against restraints of trade.

6.14     PEC's actions in terminating Plaintiffs was part of the concerted action with NVA to impose illegal restraints of trade and monopoly practices upon them and this community, in violation of the foregoing public policy, and both Defendants should be liable, jointly and severally, for that termination.

6.15     Plaintiffs suffered economic, professional and emotional damages as a direct result of Defendant PEC's unlawful conduct, including the damages pled at Section V (A) (5.13) above.

**C.    <u>Breach of Contract.</u>**

6.16     PEC's Bylaws and Articles of Incorporation constitute a contract between the Plaintiffs and Defendant PEC, and PEC was bound to such duties, as were Plaintiffs.

6.17     As implemented through business documents and longstanding practice, Plaintiffs and the other PEC veterinarians historically



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

determined their percentage-based compensation formula based upon agreement amongst each other. This process, implemented and maintained over the years, created an implied contract between Plaintiffs and PEC.

6.18    PEC and NVA had a duty to conform to this implied contract, and breached that duty.

6.19    Defendant PEC, in concert with NVA, began efforts to impose national compensation norms on Plaintiffs and the other employed veterinarians, which breached and reduced that agreed-upon percentage-based compensation, and thereby breached PEC's contract with Plaintiffs.

6.20    Plaintiffs and other PEC veterinarians worked at PEC without restriction upon their right to practice elsewhere, were they to leave or to be terminated. This agreement honored their right to compete if discharged, and was an implied contract. PEC disregarded and breached that contract by imposing restrictions on their right to compete in order to remain employed at PEC, without added consideration.

6.21    Under PEC's Articles of Incorporation, only veterinarians licensed to practice veterinary medicine in the state of Washington, and who practiced within a 50-mile radius of PEC's main office, could hold shares in PEC. NVA was not such an individual, and did not qualify for stock



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

ownership in PEC.  Defendant PEC, in concert with NVA, disregarded and agreed to breach this contract arising through these Articles, and did in fact breach this contract, including by accepting terms of sale with NVA in May 2018.

6.22    Under its Articles, any PEC shareholder selling their shares must sell back to PEC, or to a similar local veterinarian licensed to practice in the state of Washington. Defendant PEC, in concert with NVA, disregarded and agreed to breach this contract arising through its Articles, including by accepting terms of sale in May 2018.

6.23    Under bylaws, no shareholder of PEC could hold more than 1000 shares.  Defendant PEC, in concert with NVA, disregarded and agreed to breach this contract arising through these bylaws to allow NVA to acquire all outstanding shares of PEC, far in excess of the 1,000 share limit, including by accepting terms of sale with NVA in May 2018.

6.24    Under bylaws, no PEC stock carried any non-compete and exclusive referral provisions. Defendant PEC, in concert with NVA, disregarded and agreed to breach this contract of the free exchange of competition and referrals, including by accepting terms of sale with NVA in May 2018.

MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

6.25    PEC's actions in breaching and violating its contractual duties with and to Plaintiffs was part of PEC and NVA's concerted action to impose illegal restraints of trade and monopoly practices upon Plaintiffs in violation of the foregoing prohibited business practices, and both Defendants should be liable, jointly and severally, for these breaches of contract in pursuit of this unlawful intended end result.

6.26    PEC's breaches of contract caused the damages detailed at Section V (A) (5.13) above.

WHEREFORE, the Plaintiffs ask for the following relief:

## VII.  DEMAND FOR RELIEF

Plaintiffs request judgment as follows:

7.1    That judgment be entered on the above claims and for damages in favor of the Plaintiffs and against the Defendants jointly and severally for all damages incurred and to be incurred, as well as judgment for those statutory damage multipliers.

7.2    That judgment be entered against Defendants jointly and severally for threefold of the actual damages sustained, along with the cost of suit, including a reasonable attorney's fee, plus interest, under 15 U.S.C. § 15 (b).

MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

7.3    That judgment be entered against Defendants jointly and severally for civil damages, attorney fees, and three times damages per the provisions of RCW § 19.86.090.

7.4    That Defendants, as corporations, should be required to pay the civil penalties for violations of RCW 19.86.030 or 19.86.040 of not more than five hundred thousand dollars, per RCW § 19.86.140.

## VIII.  <u>JURY DEMAND.</u>

8.1    Plaintiffs request a jury.

DATED this 8th day of November, 2020.

**MARY SCHULTZ LAW, P.S.,**

<u>/s/Mary Schultz</u>
**MARY SCHULTZ**, WSBA #14198
Attorney for Plaintiffs
2111 E. Red Barn Lane
Spangle, WA 99031
Tel: (509) 245-3522, Ext. 2
E-mail: Mary@MSchultz.com



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308